**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RACHEL MARIE POWELL,
*Address Filed Under Seal,*
Plaintiff,

-against-

UNITED STATES OF AMERICA,
*c/o U.S. Attorney's Office, District of Columbia,*
*950 Pennsylvania Avenue, NW Washington, DC 20530*

MERRICK GARLAND, individually,
*c/o Arnold & Porter 601 Massachusetts Ave, NW*
*Washington, DC 20001-3743*

MATTHEW GRAVES, individually,
*c/o Winston Taylor LLP, 1901 L Street NW,*
*Washington, DC 20036*

DONALD W. WASHINGTON, individually,
*Jones Walker LLP, Suite 1600, 600 Jefferson St,*
*Lafayette, LA 70501*

KATHLEEN LANDERKIN, individually,
*Warden, Baltimore Pre-Trial Complex,*
*300 E. Madison Street, Baltimore, MD 21202*

ROBERT ANTHONY DIXON, individually,
*U.S. Marshals Service, Superior Court of D.C.,*
*Moultrie Courthouse, 500 Indiana Avenue NW,*
*Washington, DC 20001*

and

JOHN DOES 1-25, individually,
Defendants.

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff RACHEL MARIE POWELL (hereinafter, "Plaintiff" or "Powell") by and through her attorneys, Raiser, Kenniff & Lonstein, P.C. brings this Complaint and respectfully alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for damages arising from Defendants' violations of Plaintiff's rights under to the United States Constitution, as well as for tortious conduct actionable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

2. Plaintiff was targeted, arrested, prosecuted, and punished because of her constitutionally protected expressive and associational activity as a member of the protesters who gathered at the Capitol on January 6th, 2021 (hereinafter, the group of people prosecuted for their activities at or near the Capitol Building on January 6th, 2021, will be referred to as the "January 6th Defendants"). Defendants selectively and disproportionately exercised governmental authority against Plaintiff as part of a broader campaign directed at January 6th Defendants. Through retaliatory prosecution, discriminatory detention practices, deliberate indifference to Plaintiff's health and safety, and other unlawful conduct, Defendants violated Plaintiff's constitutional rights and caused severe physical, emotional, reputational, and economic injury.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5. Jurisdiction over Plaintiff's constitutional claims against individual federal officers is conferred by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), and its progeny.

6. Jurisdiction over Plaintiff's claims against defendant UNITED STATES OF AMERICA (the "United States") is conferred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

7. To the extent Plaintiff asserts constitutional claims against District of Columbia correctional officials acting under color of District of Columbia law, jurisdiction is also conferred by 42 U.S.C. § 1983.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the acts and omissions giving rise to Plaintiff's claims occurred in this District.

9. This Court has personal jurisdiction over defendant KATHLEEN LANDERKIN pursuant to the District of Columbia Code §§ 13-422 and 13-423(a)(3).

10. Plaintiff attempted to file administrative grievances to timely contest her mistreatment while incarcerated at the District of Columbia Department of Corrections (hereinafter, "D.C. Jail") but observed that whenever any of the other January 6th Defendants attempted to do so, they were the subject of punitive and retaliatory measures taken by corrections personnel. Corrections officers would harshly interrogate those who attempted to file grievances and/or simply refuse to furnish the grievance forms. If forms were furnished, corrections officers would alter the forms to change the dates on the forms, thus rendering the forms untimely, or would vaguely claim that the forms were otherwise filled out improperly. While at the D.C. Jail, Plaintiff was eventually told that she could not file more grievances and personnel refused to give her grievance forms after that point. Accordingly, Plaintiff was unable to file the appropriate

grievance forms to challenge the cruel and inhumane conditions of Plaintiff's incarceration at the D.C. Jail.

11. Additionally, while incarcerated at Secure Female Facility Hazelton ("SFF Hazelton"), Plaintiff elevated her grievances to the regional or central office, but they were arbitrarily rejected or deferred to facility-level findings. In some instances, Plaintiff's facility councilors or warden discarded her grievance papers without reason, or otherwise refused to take and register the grievances. Accordingly, Plaintiff was unable to file the appropriate grievance forms to challenge the cruel and inhumane conditions of Plaintiff's detention at the D.C. Jail or her incarceration at FCC Hazelton.

12. In other words, Plaintiff exhausted all administrative remedies that were available to her. To the extent Defendants contend otherwise, the grievance system was unavailable because grievances were not processed, Plaintiff was not informed of appeal rights, grievances were resolved without meaningful review, and officials retaliated against Plaintiff for using the grievance system.

13. The failure to properly resolve grievances is a systemic issue. As was relayed to Camile Williams, Deputy Director of Programs and Supplementary Services within the D.C. Department of Corrections, by the United States Marshals Service on January 3, 2022, "the prisoner grievance program continues to present challenges," including, but not limited to, a lack of timely, proper and/or sufficient responses.

14. On or about November 24, 2025, Plaintiff transmitted four administrative Notices of Claim to the United States Department of Justice ("DOJ") and the United States Bureau of Prisons setting forth the factual basis for his claims and demanding a sum certain. More than six months elapsed without final denial.

15. As of the date of this Complaint, the United States failed to settle or issue a final denial of Plaintiff's claims within the statutory period. More than 180 days had elapsed, resulting in constructive exhaustion under 28 U.S.C. § 2675(a).

**PARTIES**

16. Plaintiff is a United States citizen and resident of Mercer County, State of Pennsylvania.

17. Defendant UNITED STATES OF AMERICA is sued pursuant to the FTCA for tortious acts and omissions of federal employees acting within the scope of their employment.

18. Defendant MERRICK GARLAND ("Garland") is sued in his individual capacity for actions taken while serving as Attorney General of the United States.

19. Defendant MATTHEW M. GRAVES ("Graves") is sued in his individual capacity for actions taken while serving as United States Attorney for the District of Columbia.

20. Defendant DONALD W. WASHINGTON ("Marshal Washington") is sued in his individual capacity for actions taken while serving as the director of the United States Marshals Service ("USMS").

21. Defendant DEPUTY WARDEN KATHLEEN LANDERKIN ("Deputy Warden Landerkin") is sued in her individual capacity for actions taken while serving as the Deputy Warden of the D.C. Jail.

22. Defendant ROBERT ANTHONY DIXON ("Marshal Dixon") is sued in his individual capacity for actions taken while serving as the U.S. Marshal for the USMS for the Superior Court of the District of Columbia.

23. Defendants JOHN DOES 1-25, individually, include but are not limited to unknown agents, officers, employees, supervisors, policymakers, prosecutors, public-affairs personnel, and other officials of the United States Department of Justice, the United States

Attorney's Office for the District of Columbia, and/or the Federal Bureau of Investigation who personally participated in, directed, approved, ratified, supervised, or knowingly permitted the investigative, public-facing, charging, prosecutorial, search, arrest, or other law-enforcement actions complained of herein.

## FACTUAL ALLEGATIONS

24. On January 6th, 2021 a joint session of the United States Congress convened at approximately 1:00 p.m. to certify the Electoral College vote of the 2020 Presidential Election.

25. On that day, Plaintiff was present in Washington, D.C. to exercise her First Amendment rights by attending a political rally and protesting the certification of the Electoral College vote.

26. Prior to her arrest, Plaintiff had never been convicted of a crime and maintained longstanding ties to her community in western Pennsylvania. She was the primary caregiver to her children, maintained stable residence in Pennsylvania, and had deep family and community connections. At sentencing, even the district court observed that, until the events giving rise to the prosecution, Plaintiff had lived "an outstanding life" and described January 6th Defendants such as Plaintiff as "basically good people" whose lives had been profoundly altered by the events of that day.

27. Upon learning that federal authorities were investigating her, Plaintiff did not flee, evade law enforcement, or attempt to avoid judicial process. Instead, before she even knew whether criminal charges had been filed, Plaintiff retained counsel, who contacted the United States Attorney's Office on February 3, 2021, advised that Plaintiff was represented, and offered to arrange a voluntary surrender should charges exist.

28. Rather than respond to counsel's request or arrange a voluntary surrender, Defendants proceeded with the execution of an arrest warrant and search warrant. After learning of the charges, Plaintiff nevertheless complied with federal authorities' instructions, drove approximately 240 miles across Pennsylvania to the designated FBI office, voluntarily surrendered herself without incident, surrendered her United States passport, and complied with all release conditions imposed by the court. As contemporaneously acknowledged by Plaintiff's counsel, "She did not run, nor did she hide."

29. Following a full detention hearing, the magistrate judge rejected the Government's request for pretrial detention and ordered Plaintiff released on conditions after concluding that conditions of release could reasonably address any concerns identified by the Government. Nevertheless, Defendants immediately sought emergency review of that release order and continued to pursue increasingly restrictive measures throughout Plaintiff's prosecution. Defendant's attempt to continue to detain Plaintiff was denied.

30. The indictment against Plaintiff was filed on March 3, 2021. The criminal action proceeded in the United States District Court, District of Columbia, under Case No. 21-cr-179.

31. A final superseding indictment was entered on April 5, 2023. Plaintiff was charged with violations of:

a. 18 U.S.C. § 231(a)(3): Civil Disorder;

b. 18 U.S.C. § 1512(c)(2): Obstruction of an Official Proceeding and Aiding and Abetting:

c. 18 U.S.C. § 1361: Destruction of Government Property;

d. 18 U.S.C. §§ 1752(a)(1) & (b)(1)(A): Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon;

e. 18 U.S.C. §§ 1752(a)(2) & (b)(1)(A): Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon;

f. 18 U.S.C. §§ 1752(a)(4) & (b)(1)(A): Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon;

g. 40 U.S.C. § 5104(e)(2)(D): Disorderly Conduct in a Capitol Building;

h. 40 U.S.C. § 5104(e)(2)(F): Act of Physical Violence in the Capitol Grounds or Buildings; and

i. 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building

32. Notably, Plaintiff was charged with violating 18 U.S.C. § 1512(c)(2), obstruction of an official proceeding.

33. Within weeks of January 6, 2021, Plaintiff became one of the most publicly recognizable January 6th Defendants. National media outlets prominently featured Plaintiff, referring to her as the "Bullhorn Lady" and "Pink Hat Lady," while her image appeared on an FBI "Be On the Lookout" poster and was repeatedly broadcast in national news coverage. The resulting publicity transformed Plaintiff into one of the public faces of the January 6 investigation.

34. The United States itself relied upon and amplified that public notoriety. In seeking Plaintiff's detention, the Government submitted a New Yorker profile of Plaintiff as an exhibit to its detention briefing and emphasized Plaintiff's media profile as part of its argument that she warranted extraordinary treatment. Plaintiff's public prominence became intertwined with the Government's broader effort to portray January 6 prosecutions as a central Department of Justice priority.

35. Plaintiff, via counsel, moved to dismiss her charge under 18 U.S.C. § 1512(c), arguing that the legislative intent behind the statute was contrary to the Government's charging theory.

36. Plaintiff also submitted a decision from a judge presiding over the criminal trial of another January 6th Defendant that found that the Government's theory under 18 U.S.C. § 1512(c) was unsupportable.

37. The Government opposed all attempts to limit or narrow the application of 18 U.S.C. § 1512 and proceeded with its prosecution of Plaintiff under this theory.

38. Following a bench trial, on July 18, 2023, the Court convicted Plaintiff on all nine counts she was charged with, including violation of 18 U.S.C. § 1512(c)(2).

39. On October 17, 2023, Plaintiff was sentenced to a total of 57 months' incarceration. Plaintiff's incarceration was heavily influenced by her conviction for violation of 18 U.S.C. § 1512(c)(2). Without the § 1512 conviction, Plaintiff's total offense level would have been much lower and would have resulted in a drastically reduced sentence.

40. On June 28, 2024, the Supreme Court of the United States issued its decision in *Fischer v. United States*, 603 U.S. 480 (2024), substantially narrowing the scope of 18 U.S.C. § 1512(c)(2) and rejecting the expansive interpretation utilized in many January 6 prosecutions.

41. On November 13, 2024, Plaintiff moved to vacate her conviction under 18 U.S.C. § 1512 and to be re-sentenced.

42. Even though Plaintiff's conviction under 18 U.S.C. § 1512(c) was vacated by the Supreme Court of the United States in *Fischer*, the United States opposed re-sentencing Plaintiff.

43. Over the Government's objection, the Court granted Plaintiff's request for resentencing.

44. Plaintiff was transferred to the D.C. Jail for resentencing.

45. The Deputy Warden of the D.C. Jail was defendant Deputy Warden Landerkin, who was known to have extreme animus toward Trump supporters.

46. This animus was expressed by making the following now-deleted posts on the social media site "X" (formerly known at Twitter):

a. "F--- everyone who supports Trump" (November 24, 2019);

b. "How are we allowing Trump and his lackeys destroy our country?" (November 24, 2019);

c. "About time they stop giving Trumps mouthpieces time to spew their lies" (February 8, 2020);

d. "Trump is doing more damage to this county then foreign terrorists ever have" (September 11, 2020);

e. "… if you are in the crowd behind Trump you are trash. While very animated, you are without conscious, feeling or morals…" (October 13, 2019);

f. "… Republican fascist" (July 27, 2019).[1]

47. Despite this known animus, the United States government, by and through its employees defendants Marshal Washington and Marshal Dixon, placed Plaintiff in the D.C. Jail while Plaintiff awaited resentencing.

48. Upon information and belief, Defendants Washington and Dixon were responsible, in whole or in part, for decisions regarding the placement, transfer, housing, and continued detention of federal detainees, including January 6th Defendants housed at the D.C. Jail.

[1] https://x.com/alexbruesewitz/status/1469666224552517637

49. Upon information and belief, Washington and Dixon knew or reasonably should have known that Deputy Warden Landerkin had publicly expressed hostility toward supporters of President Donald J. Trump and individuals associated with the January 6 protests.

50. Upon information and belief, Washington and Dixon received inspection reports, grievances, judicial findings, or other notice concerning the conditions affecting January 6 detainees and nevertheless continued Plaintiff's placement there.

51. The statements attributed to Deputy Warden Landerkin were publicly available and widely circulated, including through social-media posts and public reporting.

52. Upon information and belief, Washington and Dixon knew or reasonably should have known that the continued placement of January 6 detainees in a facility operated by officials harboring such animus created a substantial risk that those detainees would be subjected to discriminatory treatment, punitive conditions, unequal treatment, retaliation, or other constitutional deprivations.

53. Despite that knowledge, Washington and Dixon continued authorizing, approving, maintaining, or permitting Plaintiff's placement and continued detention at the D.C. Jail.

54. Upon information and belief, January 6th Detainees were subjected to restrictions, conditions, and treatment materially different from those imposed upon similarly situated federal pretrial detainees who were not charged in connection with events occurring on January 6, 2021, such as prolonged lockdowns, extensive restrictions on movement, recreation, social interaction, and visitation.

55. These restrictions resulted in severe emotional distress, isolation, and deterioration of family relationships.

56. When Plaintiff arrived at the D.C. Jail to await resentencing, she was subject to many of the same conditions that the January 6th Detainees were subjected to.

57. While at the D.C. Jail awaiting resentencing, Plaintiff was denied hygienic care, was not given the kosher diet she requested, and was kept in a holding cell post-transfer until pardon.

58. The conditions imposed upon Plaintiff were not the product of individualized security assessments.

59. Plaintiff did not present a unique institutional threat that justified the restrictive conditions under which she was confined.

60. Defendants nevertheless maintained these restrictions for prolonged periods of time.

61. The conditions described herein were excessive in relation to any legitimate governmental objective.

62. Resentencing proceedings began on January 17, 2025. However, prior to the conclusion of those proceedings, Plaintiff was granted a Presidential pardon, the Government moved to dismiss the indictment against Plaintiff, and Plaintiff was released from the D.C. Jail.

63. Upon pardon, Plaintiff was denied a meal, lavatory use, and family contact until USMS regained direct custody of her.

## **THE GOVERNMENT'S JANUARY 6 ENFORCEMENT CAMPAIGN**

64. Following January 6, 2021, the United States Department of Justice publicly announced that the investigation and prosecution of January 6th Defendants would constitute one of the largest criminal enforcement efforts in the history of the Department.

65. At all relevant times, Defendant Merrick Garland served as Attorney General of the United States and exercised supervisory authority over Department-wide policies concerning January 6th investigations and prosecutions.

66. At all relevant times, Defendant Matthew Graves served as United States Attorney for the District of Columbia and exercised supervisory authority over January 6th prosecutions within the District of Columbia.

67. Throughout their respective tenures, Garland and Graves repeatedly described January 6th prosecutions as among the Department's highest priorities and publicly emphasized the importance of those prosecutions in official statements, media appearances, congressional testimony, and Department of Justice communications.

68. Upon information and belief, Garland and Graves approved, implemented, supervised, ratified, or knowingly permitted investigative, charging, detention, plea-negotiation, sentencing, and appellate policies applicable to January 6th Defendants, including Plaintiff.

69. Upon information and belief, Garland and Graves approved or ratified the Department's widespread use of 18 U.S.C. § 1512(c)(2) despite substantial judicial disagreement concerning the scope of that statute and despite knowing that the charge materially increased detention exposure, sentencing exposure, and prosecutorial leverage.

70. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that

expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

71. Plaintiff alleges that these policies subjected January 6th Defendants, including Plaintiff, to materially harsher investigative, charging, detention, and sentencing practices than similarly situated criminal defendants and were intended, at least in part, to maximize deterrent effect and public example-making.

## **AS AND FOR A FIRST CAUSE OF ACTION**

*42 U.S.C. § 1983*
*Violation of the First and Fifth Amendments*
*Political Viewpoint Discrimination*

72. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

73. At all relevant times giving rise to this cause of action, Plaintiff was a federal prisoner temporarily housed at the District of Columbia Jail while awaiting resentencing following the vacatur of one of her federal convictions.

74. Defendant Landerkin and the Doe Defendants acted under color of District of Columbia law.

75. The First Amendment prohibits government officials from discriminating against prisoners because of their political beliefs or protected expression.

76. The Fifth Amendment prohibits federal officials and those acting under color of District of Columbia law from subjecting similarly situated detainees or prisoners to arbitrary, discriminatory, or irrational treatment lacking a legitimate governmental objective.

77. Plaintiff was detained because she had been charged in connection with the events of January 6, 2021 and was housed among other detainees similarly charged.

78. Upon information and belief, Defendants viewed Plaintiff and other January 6 detainees with hostility because of their actual or perceived political beliefs, political associations, support for President Donald J. Trump, participation in political demonstrations, and opposition to positions favored by Defendants.

79. Upon information and belief, Defendants intentionally subjected Plaintiff to restrictions, conditions, and treatment materially different from those imposed upon similarly situated pretrial detainees who were not associated with January 6.

80. These restrictions included, but were not limited to, denying Plaintiff appropriate meals, denying Plaintiff appropriate and necessary hygienic services, confining Plaintiff in a holding cell after transfer, and denying Plaintiff contact with her family after her pardon.

81. The restrictions imposed upon Plaintiff were not the product of individualized security determinations, disciplinary findings, or legitimate correctional necessities specific to Plaintiff.

82. Rather, upon information and belief, Defendants imposed and maintained these restrictions because of Plaintiff's actual or perceived political beliefs, associations, expressive conduct, protected activity, status as a January 6th Defendant, and/or her attempts to complain about unconstitutional treatment.

83. The conditions imposed upon Plaintiff were excessive in relation to any legitimate governmental objective and were not reasonably related to institutional security, order, or administration.

84. Upon information and belief, these restrictions would not have been imposed on similarly situated inmates absent that protected status.

85. By intentionally imposing punitive restrictions unrelated to legitimate governmental objectives, Defendants violated Plaintiff's rights under the Due Process Clause of the Fifth Amendment.

86. By imposing adverse treatment because of Plaintiff's actual or perceived political beliefs, political associations, protected expressive activity, status as a January 6th Defendant, and/or complaints regarding jail conditions, Defendants violated Plaintiff's rights under the First Amendment.

87. Defendants acted intentionally, willfully, maliciously, recklessly, and with deliberate indifference to Plaintiff's constitutional rights.

88. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, emotional distress, humiliation, anxiety, psychological injury, pain and suffering, damage to reputation, and other economic and non-economic damages.

**AS AND FOR A SECOND CAUSE OF ACTION**

*Fifth Amendment Equal Protection* – Bivens

*Federal Individual Defendants*

89. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

90. Defendants Garland and Graves (the "DOJ Defendants") personally participated in, approved, implemented, supervised, ratified, or knowingly permitted Department of Justice policies and practices governing the investigation, charging, detention, prosecution, and sentencing of January 6th Defendants, including Plaintiff.

91. Upon information and belief, those policies included the widespread use of 18 U.S.C. § 1512(c)(2), aggressive detention positions, enhanced charging decisions, and litigation strategies designed to increase detention exposure, sentencing exposure, prosecutorial leverage, public deterrence, and public example-making in January 6th cases.

92. Plaintiff alleges that the DOJ Defendants intentionally subjected January 6th Defendants, including Plaintiff, to investigative, charging, detention, and prosecutorial practices materially different from those employed against similarly situated criminal defendants because of their actual or perceived political viewpoints, associations, and participation in events occurring on January 6, 2021.

93. Upon information and belief, the DOJ Defendants received regular briefings concerning January 6th investigations and prosecutions, were aware of the policies challenged herein, and knowingly approved, ratified, or permitted their continued implementation.

94. No sufficient governmental interest justified the disparate treatment imposed upon Plaintiff. In the alternative, Defendants lacked a rational basis for treating Plaintiff differently from similarly situated defendants prosecuted for comparable conduct.

95. The DOJ Defendants' conduct violated the equal protection component of the Fifth Amendment and directly and proximately caused Plaintiff to suffer loss of liberty, emotional distress, reputational injury, economic loss, and other damages.

## AS AND FOR A THIRD CAUSE OF ACTION

*Fifth Amendment Due Process* – Bivens
*Deliberate Indifference to Known Risk of Constitutional Injury*
*Against Defendants Donald W. Washington and Robert Anthony Dixon*

96. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

97. At all relevant times, Washington and Dixon exercised authority over the placement, transfer, housing, and continued detention of federal detainees, including Plaintiff and other January 6th Detainees.

98. Upon information and belief, Washington and Dixon knew or reasonably should have known that Deputy Warden Kathleen Landerkin had publicly expressed hostility toward supporters of President Donald J. Trump and individuals associated with January 6, 2021.

99. Upon information and belief, Washington and Dixon further knew or reasonably should have known that placing January 6th Detainees in a facility operated by officials harboring such animus created a substantial risk that those detainees would be subjected to discriminatory treatment, punitive confinement conditions, retaliation, unequal treatment, and other constitutional deprivations.

100. Washington and Dixon received grievances, complaints, correspondence, reports, judicial findings, media coverage, and other information concerning the treatment of January 6th Detainees housed at the D.C. Jail and were therefore on notice of the risks described herein.

101. Despite such notice, Washington and Dixon continued authorizing, approving, maintaining, or permitting Plaintiff's placement and continued detention at the D.C. Jail.

102. Washington and Dixon failed to take reasonable measures to protect Plaintiff from foreseeable constitutional injuries arising from the conditions of confinement and discriminatory treatment described herein.

103. Their actions and omissions were intentional, reckless, malicious, or undertaken with deliberate indifference to Plaintiff's constitutional rights.

104. As a direct and proximate result of the foregoing, Plaintiff suffered loss of liberty, emotional distress, physical injury, reputational harm, and economic damages.

## **AS AND FOR A FOURTH CAUSE OF ACTION**

*Negligence - FTCA*

105. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

106. This claim is asserted solely against Defendant United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680.

107. At all relevant times, Plaintiff was in the custody of the Federal Bureau of Prisons at Secure Female Facility Hazelton ("SFF Hazelton").

108. By accepting Plaintiff into its custody, Defendant United States, acting through the Federal Bureau of Prisons and its employees acting within the scope of their employment, owed Plaintiff a duty to exercise reasonable care in providing reasonably safe housing, sanitary living conditions, appropriate medical care, adequate nutrition, and protection from reasonably foreseeable risks of physical injury and illness.

109. Defendant United States, through its employees, agents, and servants, breached those duties by, among other things:

a. failing to maintain reasonably sanitary living conditions;

b. permitting persistent rodent infestation and unsanitary environmental conditions;

c. permitting leaking roofs, flooding, and other hazardous living conditions;

d. exposing Plaintiff to chemical irritants, including pepper spray, without taking reasonable measures to protect her health or provide appropriate follow-up care;

e. failing to timely evaluate, diagnose, and treat Plaintiff's respiratory symptoms following her exposure to pepper spray;

f. failing to provide Plaintiff with reasonably safe and adequate living conditions while she remained in federal custody;

g. failing to provide Plaintiff with approved religious meals after recognizing her religious dietary needs;

h. negligently assigning Plaintiff to housing that unnecessarily exposed her to unreasonable risks to her physical safety, privacy, and emotional well-being.

110. As a direct and foreseeable result of Defendant United States' negligence, Plaintiff developed difficulty breathing, chest congestion, and a persistent dry cough.

111. Despite Plaintiff's complaints and requests for care, Defendant United States, through its employees, failed to provide reasonable medical evaluation and treatment, causing Plaintiff's respiratory condition to persist.

112. As a direct and proximate result of Defendant United States' negligence, Plaintiff suffered physical injury, pain and suffering, emotional distress, inconvenience, and other economic and non-economic damages, including a persistent respiratory condition that continues to affect her to this day.

113. Defendant United States is liable for the foregoing injuries pursuant to the Federal Tort Claims Act.

**AS AND FOR A FIFTH CAUSE OF ACTION**
*Malicious Prosecution - FTCA*

114. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

115. This claim is asserted solely against Defendant UNITED STATES OF AMERICA ("United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.

116. Acting through federal investigative and law-enforcement personnel acting within the scope of their employment, Defendant United States caused criminal proceedings to be initiated and continued against Plaintiff under 18 U.S.C. § 1512(c)(2) in *United States v. Powell*, No. 21-cr-179 (D.D.C.).

117. The conduct giving rise to this claim includes the investigation, presentation, and continued pursuit of the § 1512(c)(2) obstruction charge against Plaintiff, separate and apart from any other criminal charges asserted against her.

118. At all relevant times, federal officials knew or should have known that substantial legal questions existed regarding the scope and applicability of 18 U.S.C. § 1512(c)(2) to the conduct alleged against Plaintiff.

119. Despite those substantial legal deficiencies, federal officials continued pursuing the § 1512(c)(2) charge against Plaintiff through pretrial proceedings.

120. Federal officials did this knowing that the § 1512(c)(2) charge carried a twenty-year statutory maximum, the highest sentence of all the charges Plaintiff was charged with. The § 1512(c)(2) charge dramatically increased the sentencing guidelines for Plaintiff and materially increased sentencing exposure.

121. Upon information and belief, federal officials intentionally pursued the § 1512(c)(2) charge despite serious doubts concerning whether Plaintiff's alleged conduct fell within the proper scope of the statute.

122. Plaintiff alleges that the § 1512(c)(2) charge was pursued without probable cause because the conduct attributed to Plaintiff did not satisfy the essential elements ultimately recognized by the Supreme Court of the United States in *Fischer v. United States*.

123. Rather than treating the applicability of § 1512(c)(2) as an unsettled legal issue, federal officials aggressively defended the unprecedented interpretation of the statute in district courts, the Court of Appeals, and the Supreme Court while continuing to prosecute Plaintiff under that theory.

124. The Government's continued defense of the § 1512(c)(2) charge materially prolonged Plaintiff's exposure to enhanced criminal penalties, increased her advisory Sentencing Guidelines range, delayed correction of her unlawful conviction, and ultimately resulted in her return to the D.C. Jail for resentencing proceedings.

125. Plaintiff further alleges that federal officials acted with malice and for improper purposes, including the desire to secure enhanced detention, increased sentencing exposure, and increased leverage against Plaintiff beyond that otherwise available under the remaining charges.

126. On June 28, 2024, the Supreme Court issued its decision in *Fischer v. United States*, substantially narrowing the scope of 18 U.S.C. § 1512(c)(2).

127. Plaintiff's prosecution on the violation of 18 U.S.C. § 1512(c)(2) terminated when the Court of Appeals vacated and remanded Plaintiff's conviction under the charge and the Government dismissed the charge.

128. The afore-described malicious prosecution of Plaintiff proximately caused Plaintiff to be unnecessarily incarcerated, receive a substantially longer sentence, and caused her incarceration at the D.C. Jail, causing emotional distress, reputational harm, and economic damages, thereby injuring Plaintiff.

## AS AND FOR A SIXTH CAUSE OF ACTION

*Abuse of Process – FTCA*

129. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

130. This claim is asserted solely against Defendant United States of America (the "United States") pursuant to the Federal Tort Claims Act.

131. Acting through its investigative and law-enforcement personnel acting within the scope of their employment, the United States employed and continued criminal process against Plaintiff for purposes beyond the legitimate adjudication of criminal liability.

132. Upon information and belief, federal officials used criminal process, including the continued pursuit of charges under 18 U.S.C. § 1512(c)(2), to obtain collateral objectives unrelated to the proper purpose of criminal proceedings, including increasing Plaintiff's detention exposure, sentencing exposure, litigation burdens, and public stigmatization, and maximizing the deterrent effect of January 6th prosecutions.

133. Federal officials continued utilizing such process despite substantial legal challenges to the Government's interpretation of 18 U.S.C. § 1512(c)(2) and despite knowing that the challenged charge materially increased prosecutorial leverage and the consequences faced by Plaintiff.

134. Upon information and belief, federal officials used and maintained criminal process not solely to adjudicate Plaintiff's alleged criminal liability, but also to increase leverage over Plaintiff and similarly situated January 6th Defendants and to create public deterrence through the use of enhanced criminal charges.

135. Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

136. The United States sought pretrial detention of Plaintiff, ignoring that Plaintiff voluntarily surrendered without incident, had substantial community and family ties, and was the

mother of eight children. The Government went so far as to initiate an emergency appeal of a Magistrate Judge's order releasing Plaintiff from pre-trial detention.

137. Even after the Supreme Court rejected the Government's interpretation of §1512(c)(2), federal officials opposed Plaintiff's resentencing and sought to preserve the practical consequences of the invalidated charge.

138. Upon information and belief, those actions were undertaken not merely to adjudicate Plaintiff's remaining criminal liability, but to preserve the enhanced punitive and deterrent effects previously achieved through the invalidated obstruction charge.

139. Even after the Supreme Court rejected the Government's expansive interpretation of §1512(c)(2), federal officials continued using criminal process by opposing resentencing and seeking to preserve the practical consequences of the invalidated charge.

140. The acts described herein constituted a willful misuse of criminal process for purposes other than those for which such process was designed.

141. As a direct and proximate result of the United States' abuse of process, Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, litigation expenses, and other damages.

142. Defendant United States is liable for those injuries pursuant to the Federal Tort Claims Act.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
*Intentional Infliction of Emotional Distress – FTCA*

143. Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

144. Defendant the United States, by and through its employees and agents, engaged in extreme and outrageous conduct, including subjecting Plaintiff to overly restrictive, arbitrary, and capricious conditions during the pre-trial period; restricting Plaintiff's access to her children;

excessive and retaliatory solitary confinement; providing Plaintiff with improper and non-religiously compliant food while detained and/or imprisoned; exposing Plaintiff to chemical agents while detained and/or imprisoned; performing excessive, unnecessary, improper, and humiliating strip searches on Plaintiff, including strip searches while Plaintiff was in the presence of biological male prisoners, while Plaintiff was imprisoned; withholding food from Plaintiff, especially when Plaintiff's family would visit her; placing Plaintiff, a biological woman, in the same living quarters with biological men while Plaintiff was imprisoned.

145. Defendant the United States, by and through its employees and agents, acted intentionally or with reckless disregard of the high probability that their conduct would cause severe emotional distress.

146. The afore-described conduct was the proximate cause of Plaintiff's injuries.

147. As a result of the afore-described conduct, Plaintiff suffered severe emotional distress, including anxiety, trauma, humiliation, sleep disturbance, and fear of permanent disability or death.

**WHEREFORE**, and for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in the Plaintiff's favor,

a. Awarding compensatory damages to the Plaintiff, plus post-judgment interest;

b. Awarding punitive damages to the Plaintiff;

c. Awarding Plaintiff reasonable costs, disbursements, and attorney's fees; and

d. Awarding any such other and further relief as this Court finds is required in the interest of justice.

Dated: October 6, 2026

Respectfully submitted,
/s/Alexander Lonstein

Alexander Lonstein
RAISER, KENNIFF & LONSTEIN, P.C.
99 Park Avenue, Suite 1530
New York, NY 10016
alexander@rkl.law